IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

NOV 2 7 2002 'WT'

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. | ) |
| ARTHUR DALE HICKEY, Reg. No. A- 87634 | ) |
| Pontiac Correctional Center, | ) |
| | ) |
| | ) |
| Petitioner, | ) No: 02 C 2443 |
| | ) |
| v. | ) Hon. Matthew F. Kennelly |
| | ) |
| | ) Judge Presiding. |
| JAMES SCHOMIG, Warden, | ) |
| Pontiac Correctional Center, | ) |
| | ) |
| Respondent. | ) |

DOCKETED
DEC 0 5 2002

## NOTICE OF FILING

TO:  William L. Browers                    Jeff Tomczak
     Assistant Illinois Attorney General   Will County Assistant State's Attorney
     100 W. Randolph St, 12th Fl.          121 North Chicago Street
     Chicago, IL 60601                     Joliet, IL 60432

PLEASE TAKE NOTICE that on November 27, 2002, we caused to be filed with the United States District Clerk for the Northern District of Illinois a Petition for Writ of Habeas Corpus and Exhibits thereto, copies of which are hereby served upon you.

RAVITZ & PALLES, P.C.

By: _____
    Attorneys for Petitioner

Eric S. Palles
RAVITZ & PALLES, P.C.
203 N. LaSalle St., Suite 2100
Chicago, IL 60601
(312) 558-1689

14

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that he served the foregoing Notice of Filing and the above referenced documents upon the above-named counsel by first class mail on November 27, 2002, before 5:00 p.m.

**FILED**

NOV 2 7 2002

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

| | |
|---|---|
| Prisoner's Name: | Arthur Dale Hickey |
| Prisoner's Number: | A87634 |
| Place of Confinement: | Condemned Unit, Pontiac Correctional Center, Pontiac, Illinois |
| Scheduled Execution Date: | To be set by the Illinois Supreme Court, if at all, only after the final resolution of the instant petition |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DOCKETED

DEC 05 2002

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>ARTHUR DALE HICKEY, Reg. No. A-87634<br>Pontiac Correctional Center, | )<br>)<br>)<br>) |
| Petitioner, | )<br>) No: 02 C 2443 |
| v. | )<br>) Hon. Matthew F. Kennelly<br>) |
| JAMES SCHOMIG, Warden,<br>Pontiac Correctional Center, | ) Judge Presiding.<br>)<br>) |
| Respondent. | )<br>) |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## UNDER A SENTENCE OF CAPITAL PUNISHMENT

Arthur Dale Hickey, petitioner herein, by and through his attorneys, Gary Ravitz and Eric

S. Palles, Ravitz & Palles, P.C., respectfully petitions for a writ of habeas corpus under 28 U.S.C.

§2254, and in support, states the following:

### PROCEDURAL HISTORY

1.     The name and location of the court that entered the judgment of conviction and

sentence under attack are: Circuit Court of the Twelfth Judicial Circuit of Illinois, Will County,

Joliet, Illinois.

2.     The date of judgment of conviction is December 12, 1995.

3.     The sentence is that Mr. Hickey is sentenced "to death, such sentence to be carried out in the manner provided by law."

4.     The offenses involved are first degree murder, attempt murder, aggravated criminal sexual assault, home invasion, and aggravated battery with a firearm.

5.     Mr. Hickey's plea was not guilty.

6.     A jury convicted and sentenced Mr. Hickey.

7.     Mr. Hickey did not testify at trial.

8.     Mr. Hickey appealed his conviction and death sentence.

9.     The facts of Mr. Hickey's appeal are as follows:

(a)     On September 18, 1997, the Illinois Supreme Court affirmed Hickey's convictions and sentence on direct appeal. People v. Hickey, 178 Ill. 2d 256, 687 N.E.2d 910 (1997) ("Hickey I"). Copy attached as Exhibit 1. Mr. Hickey was represented on his appeal by Charles M. Scheidel and John J. Hanlon of the Office of the State Appellate Defender.

(b)     On December 1, 1997, the Illinois Supreme Court denied Mr. Hickey's petition for rehearing.

(c)     On June 26, 1998, the Supreme Court of the United States denied Hickey's petition for a writ of certiorari. Hickey v. Illinois, 141 L. Ed. 2d 742, 118 S. Ct. 2375 (1998).

10.     Other than the appeal described in paragraph 9 above, the only petitions, applications, motions or proceedings Mr. Hickey has filed or maintained relating to his convictions and sentence are described in paragraphs 11-12, below.

11.     The facts of Mr. Hickey's Illinois post-conviction proceedings are as follows:

(a)     Hickey filed his pro se petition for post-conviction relief in the Circuit Court for the Twelfth Judicial Circuit of Illinois, Will County, on July 28, 1996.

(b)     On October 15, 1998, Mr. Hickey, represented by current counsel, filed an amended petition for post-conviction relief. C. 990-1602.[1] A second and supplemental amended petition was filed on December 4, 1998. C. 1636-75.

(c)     On December 23, 1998, the circuit court granted the state's motion to dismiss the amended petitions without an evidentiary hearing.

(d)     On February 19, 1999, the circuit court denied Mr. Hickey's motion for reconsideration.

(e)     On September 27, 2001, the Illinois Supreme Court, Justices Harrison and Kilbride dissenting, affirmed the circuit court's dismissal order. People v. Hickey, 2001 Ill. LEXIS 1080 (2001) ("Hickey II") (copy attached as Exhibit 2).

(f)     On December 3, 2001, the Illinois Supreme Court denied Mr. Hickey's motion for rehearing. 2001 Ill. LEXIS 1448.

12.     On August 26, 2002, Mr. Hickey filed a Petition for Executive Clemency with the Governor of the State of Illinois, which is pending.

---

[1]     The consolidated common law records and reports of proceedings involved in the decisions of the Illinois Supreme Court in Hickey I and Hickey II are hereby incorporated by reference. Page references to the common law record are designated C; page references to the report of proceedings are designated R. An Index to the case record is attached as an appendix to this Petition. Exhibit 3.

3

13.     On December 17, 2001, the Illinois Supreme Court stayed its mandate, thereby postponing Mr. Hickey's execution, pending the final disposition of a petition for habeas corpus in federal court.

## FACTUAL BACKGROUND

A.      The State of the Non-DNA Evidence at Trial: The Physical
        Description of the Offender.

14.     Early in the morning of November 25, 1991, someone confronted, shot and killed Jeff Stephens, in the driveway of Stephens' house in Ritchie, Illinois. The offender then entered Stephens' house and sexually assaulted and shot his wife, Heather Stephens, who survived her wound. The offender took money and drove off in Heather Stephens' red Plymouth Laser, which was found later that morning in Wilmington, Illinois, a neighboring town. R. 752-814, 850-55.

15.     At trial, Heather Stephens described the offender as a white male in his mid-20s, 5'0" to 5'3" tall, 130 pounds and slightly built, with no facial hair and blond stringy head hair. R. 787-90, 876-78, 1581-88. This description was consistent with previous descriptions that she had given to authorities. For example, at 9:00 a.m. on November 25, 1991, within hours of the crime, Mrs. Stephens told a police evidence technician the offender was a "male/white in his mid 20's, light complexion, 5'3" tall and approximately 130 lbs, with a smaller build." She told this police officer that what stood out most to her about the offender was his hair, which was blond. The offender also smelled of cigarette smoke. R. 860-63, 873-80, C. 1033-34. The police evidence technician prepared a sketch of the offender according to Heather Stephens' description. Exhibit 4.[2]

---

[2]     The left side of this exhibit, which was introduced at Mr. Hickey's public clemency hearing, depicts the sketch of the offender that was prepared by the police evidence technician on November 25th; the right side of the exhibit depicts Arthur Dale Hickey.

4

16.     Heather Stephens repeatedly told the police that she could identify the offender if she ever saw him again. R.803-07, 813. Will County Sheriff investigator Gloria DeLeon met with Heather Stephens numerous times. In December 1991, and again in January 1992, Mrs. Stephens assured DeLeon that if she ever saw the offender, "I'll know him," and identify him. C. 1033-42. Based upon her interviews of Mrs. Stephens, DeLeon provided the FBI with the following composite description of the offender: A (white) male in his 20's, 5'2" tall, blond hair, no facial hair, small or thin build. R. 1581-88.

17.     Heather Stephens' efforts to assist authorities to identify the offender persisted. For example, on April 14, 1992, she advised police investigators that a few days before she had seen an individual named Sean Dixon at Rich Shouse's[3] house, and that Dixon looked like the offender. C. 1041.

18.     On February 27, 1992, Dennis M. Luporin, a police polygraph examiner, conducted a polygraph examination of Heather Stephens, "to ascertain the truthfulness of the victim's allegations that an unknown male white shot her husband...raped her, and shot her in the face." Mrs. Stephens answered no to the following questions:. (1) Did you help or plan with anyone to shoot your husband? (2) Do you know who the person is who shot your husband? (3) Have you made any false statements about this matter? The polygraph examiner concluded that Heather did not answer these questions truthfully. C. 1043-44.

---

[3]     During an interview with the police on March 3, 1992, Mrs. Stephens admitted she was romantically involved with Rich Shouse, who had been a friend of her husband's, and had engaged in sex with him at his home since Jeff Stephens' death. C. 1033-41. Telephone records obtained by the police revealed additional contacts between Mrs. Stephens and Shouse in 1991. C. 1046-52. By the time of Mr. Hickey's trial, Heather Stephens and Mr. Shouse had married.

19.    On November 25, 1991, about the time Heather Stephens testified that the crime occurred, Robert Anderson, a passerby, had noticed two men conversing that morning in the Stephens' driveway: The taller man had dark, wavy hair, and wore a blue down-type coat; the other man, who was "at least a head shorter," had blond, fluffy hair, and wore a white or blue or black checked shirt or coat.[4] Anderson also saw a large, "tannish" colored car running in the driveway. Anderson drove past the Stephens' house every day on his way to work, and always noticed the house because it was previously for sale and he had admired it. The area was well-lit due to the running car's headlights, and nearby street and porch lights. According to Mr. Anderson, Arthur Dale Hickey was not one of the two men. R. 1507-11, 1517-25, 1535-36.

20.    In 1991, Arthur Dale Hickey was 40 years old, 5'6" tall, 180 to 190 pounds and stockily built, and had a full mustache and dark head hair, with some gray in it. C. 473, R. 1332-35, 1506, 1548-59, Exhibit 4. Heather Stephens viewed numerous photographic lineups, some of which had included photographs of Arthur Dale Hickey, but never identified him, or even commented about him, when shown his photograph. R. 1588-93. At trial, when asked to identify Arthur Dale Hickey, Heather Stephens testified that, "I've not seen him before." R. 809-810.

21.    Jeffery Ford heard the alarm on the red Plymouth Laser, located in the customer parking lot of the Super Value store in Wilmington, Illinois, and observed the man who was trying to disable it. According to Mr. Ford, this man was not Arthur Dale Hickey. R. 1541-48.

22.    Heather Stephens testified that on November 25, 1991, she was awakened when Jeff got up, between 5:00 and 5:30 a.m., to take the garbage out to the road for pickup. As she lay in bed,

---

[4]      Jeff Stephens was a tall, dark-haired man. R. 752-814, 850-55.

6

Mrs. Stephens heard yelling, followed by a gunshot, coming from the direction of the driveway. As she put on her robe and stepped toward the bedroom door, a masked man entered her bedroom, displayed a gun, put her on the bed, and tied her wrists to the bedposts. This individual removed his mask, and all his clothing except for a shirt. After raping her, he put on his clothes, took about $40 and the keys to Heather Stephens' red Plymouth Laser. Mrs. Stephens heard the sound of her car alarm; shortly thereafter the offender returned to ask her how to work it. She told him, and he left. The man then returned, this time telling Mrs. Stephens to turn her head as he shot her. R. 764-71, 784-88, 807.

23.     Heather Stephens testified at trial that could not identify the offender, mainly because the room was dark (R. 775-78), yet she had previously expressed confidence in her ability to identify the offender. Indeed, she admitted telling authorities on several occasions before trial that "if I see him, I'll know him," yet never told the police that she doubted in her ability to make an identification. She also acknowledged that she had given a specific description of the offender –a white male, in his mid-20's, with medium length blond hair, 5'0" to 5'3" tall, 130 pounds, slightly built, with no facial hair – to the police sketch artist. R. 789-91, 802-07, 813.

24.     Moreover, Heather Stephens could describe the holes in the offender's ski mask as well as his dark flannel shirt, blue jeans, belt and underwear. She could observe that he was not wearing gloves. The offender was able to see well enough to tie knots around her wrists, and to find money that was on the dresser, without difficulty. R. 766, 786-92, 798, 813, 1603-04. Mrs. Stephens, who was nearsighted (hence, she was able to see things that were close to her), was not wearing glasses at the time of the incident. R. 776-83, 793-94. Nonetheless, she was face-to-face with the offender. R. 786, 793-96.

7

B.    The Identification of Vehicles in the Vicinity at the Time of the Offense.

25.    Arthur Dale Hickey's stepson, Michael Adermann, testified that in November of 1991 he lived with Hickey in Ritchie, Illinois. On November 25, at 6:00 a.m., Hickey called Adermann, who was at home, and asked Adermann to pick him up at the Shell station in Wilmington, near the "Super Value" grocery store. Adermann complied, and they returned to Ritchie. R. 1001-04. During the drive to Ritchie they passed some police cars, but Hickey did not appear nervous. Adermann let Hickey out on Route 102, not far from the village hall. Hickey then walked toward the village hall. Adermann looked back as he drove away and saw what he believed to be Hickey's van. Shortly, Hickey returned home in his van. R. 1004-07, 1010-12. Adermann was not asked to recall these events until the police interviewed him in April 1993, yet he expressed confidence they had occurred on November 25, 1991. R. 1007-09.

26.    Richard Baum, the defense investigator, subsequently authenticated a videotape exhibit, which demonstrated that Adermann, as he traveled down Route 102, could not have seen a van parked near the village hall as Adermann had claimed. R. 1560-80.

27.    On November 25, 1991, after 5:30 a.m., Richard Findley, who lived across the street from the Stephens, heard an argument. Findley heard someone say, "get back into the house," or, "get back in there." As he left for work shortly before 6:00 a.m., Findley saw a black and white two-tone van with a flat front end parked near the town hall just off Route 102. Findley knew Arthur Dale Hickey, and was familiar with Hickey's van, which had a pointed front. According to Findley, this black and white van was not Hickey's van. R. 1065-74. The parties stipulated that Arthur Dale Hickey owned a silver and gray 1987 Ford Aerostar van. R. 1336.

8

28.     Robert Anderson met with Will County law enforcement officers, and identified a photograph of the car he saw in the Stephens' driveway on the morning of the incident. Previously, Will County Sheriff investigator Gloria DeLeon and Anderson drove around in order to try to locate this car, which they found in the nearby town of Coal City, Illinois.[5] R. 1514-17, 1524-40.

C.      The Lack of Physical Evidence.

29.     A police evidence technician carefully searched the red Plymouth Laser for fingerprints, hair and fiber evidence, but found none. R. 855-60, 869-72. He testified how he prepared the composite sketch of the offender based upon Heather Stephens' description. She told him the offender was a white male in his mid-20's, 5'3" tall, 130 pounds (and slightly built), with long, stringy blond hair, but no facial hair. This man wore a quilted flannel shirt and blue jeans. R. 860-63, 873-80.

30.     Another police evidence technician testified about the crime scene investigation. At the Stephens' residence, he observed blood spots in several locations, and recovered a tooth and a spent bullet from a bathroom, and a two foot long section of nylon rope, numerous shoe prints (including one in blood on a UPS tag), hand prints, and a .25 caliber shell casing[6] from the master bedroom. A hair was recovered off a bed sheet. Outside the house, a "Kool" cigarette butt, another .25 caliber shell casing, and drag marks in the snow were observed near where Jeff Stephens was shot. The telephone wires to the house had been cut. Wire cutters were found in the master

---

[5]     See ¶70, infra.

[6]     However, a consultation report prepared by Dr. Edward Slaby of Mrs. Stephens' gunshot wound indicates that the entrance wound was "about the size of a .38 caliber bullet or possibly a .45 caliber bullet, at least from its external appearances." C. 1066.

bedroom. R. 936-60, 970-1000. Evidence technicians also searched for fingerprints on various items, including the wire cutters, doors, and jars and containers in the bathroom, but with negative results. R. 899-904, 963-65.

31.     Neither Heather Stephens nor Jeff Stephens smoked "Kool" cigarettes, and she did not know who might have thrown the "Kool" cigarette butt onto her driveway. R. 802. Arthur Dale Hickey smoked Camels. R. 1548-59.

32.     Police forensic scientist David Turngren testified that he found over 200 hairs or hair fragments on the Stephens' bed sheets. Two of the recovered pubic hairs did not originate from either victim. R. 1107-20. In Turngren's opinion, the origin of one of the pubic hairs was inconclusive; Hickey could not be excluded as the donor of the second hair. R. 1120-22. DNA analysis could have been performed on this hair, but an assistant Will County state's attorney withdrew a request to perform such analysis. No microscopic or DNA analysis was performed upon a limb hair recovered from the bed sheet. R. 1114, 1123-34.

33.     Police forensic scientist Michael Brown acknowledged that DNA tests were not ordered or attempted for the "Kool" cigarette butt found in the driveway, or for hairs found on Jeff Stephens' sweatshirt. R. 1054-58.

D.      The DNA Evidence: The Collection and Testing of Samples.

34.     At 7:10 a.m. on November 25, 1991, Riverside Hospital notified law enforcement officials that it was preparing a sexual assault kit for Heather Stephens and performing blood and urine laboratory work for RPR, pregnancy, sperm, fungus and trichomonas. C 1053-1102. Nurse

Susan Coppage obtained certain evidence, including vaginal smears on slides and swabs for the rape evidence collection kit. She also prepared additional vaginal and rectal swabs and gave these items, along with Heather Stephens' panties and Jeff Stephens' sweatshirt, to a police officer. R. 816-25.

35.     The hospital lab work involved the preparation of an endocervical gram stain, a wet mount, and gonorrhea and chlamydia cultures. The lab also analyzed the vaginal and cervical swabs. A lab report of a routine urinalysis contained a handwritten notation, "spermatozoa 0-1/hpf." Additional lab reports indicated that while the vaginal specimen was free of yeast and trichomonas, the cervical specimen showed a "rare staph epidermidis." C. 1053-1102.

36.     On December 2, 1991, a police officer delivered the rape kit and panties to the Joliet crime lab of the Illinois State Police (hereinafter referred to as ISP). R.1087. On December 5, 1991, the kit and panties were sent by mail to the ISP's Metro East crime lab in Fairview Heights, Illinois. R.1089. Police forensic scientist Michael Brown confirmed the presence of blood and semen on Heather Stephens' panties. He noted that semen was also detected on certain vaginal and rectal swabs, and that the blood and blood enzyme types (ABO and PGM types) found on the sample from the panties were consistent with the samples of an unnamed suspect. R. 1017-54, 1058-61. On September 9, 1992, Brown sent this evidence to David Metzger, who at the time was a DNA Research Coordinator for the ISP, assigned to the Springfield crime lab. R.1027.

37.     Metzger was able to extract DNA from a stain card which contained Heather Stephens' blood, from certain of the vaginal and rectal swabs, from a swatch of the panties she wore during the assault, and from a swatch of Jeff Stephens' sweatshirt. He began the process of RFLP

11

(restriction fragment length polymorphism) DNA typing, but destroyed these samples by overexposing them to restriction enzyme. They yielded no interpretable DNA results. R. 1177-81, 1230-32.

38.     Metzger contacted the Will County Sheriff about additional samples, and, in turn, he received Heather's underpants and vaginal swabs, both of which contained suspect sperm. Metzger extracted DNA from the vaginal swabs, the underpants, Jeff Stephens' sweatshirt, and Heather Stephens' blood, and used these samples to develop nine autoradiograms (autorads). R. 1185-1200. According to Metzger, the autorads showed that the suspect sample differed from the victims' samples.

39.     In April 1993, while Arthur Dale Hickey was incarcerated for another offense, ISP DNA indexing personnel purportedly made a preliminary correlation, based upon computer analysis, between his DNA and that of the suspect sample in the Stephens case. R.1594-95, C 1103.

40.     Will County Sheriff investigator Gloria DeLeon obtained further blood samples from Mr. Hickey on April 15, 1993, pursuant to a search warrant. R. 1134-38. David Metzger extracted DNA and employed PCR-based (polymerase chain reaction) typing techniques to compare samples at the HLA-DQa locus; he subjected other portions to RFLP typing at nine loci. On June 14, 1993, Metzger reported that, "DNA recovered from the semen-containing vaginal swab could have originated from Arthur Hickey. Although possible, it is extremely unlikely that the DNA originated from any other person." Metzger concluded that a random match would be expected to occur in about 1 in 15 billion Caucasians and Blacks. R. 1200-06, C. 1105. Metzger concluded that the suspect sample matched Arthur Dale Hickey's profile. R. 1190-1200.

12

41.     Arthur Dale Hickey was indicted in June 1993, based upon David Metzger's confirmatory DNA analysis. R.1594-95.

42.     Before trial, Mr. Hickey moved for the disclosure of David Metzger's personnel file. C. 572-73. The trial judge reviewed Metzger's file in camera, but refused to disclose it, ruling that the file contained no impeaching information.

43.     A copy of David Metzger's apparently redacted[7] personnel file (C. 1107-1351) shows that he joined the ISP in 1981 as a Forensic Scientist II, after he had worked in a similar capacity for the Michigan State Police.

44.     Early in Metzger's career, during his first job assignment to the Serology unit, the ISP noted his "rare ability" to communicate with user agencies without obligating the ISP to conduct extensive testing, and observed that he made an "excellent witness." Over his career, Metzger received several letters of commendation from prosecutors and law enforcement officials, both in Illinois and elsewhere, for his assistance as a consultant or expert witness. The ISP noted that Metzger's performance of such services reflected, "favorably on the Joliet Laboratory, Bureau and Department."

45.     During Metzger's next assignment to the Microscopy section, where he performed textile and fiber analysis, the ISP personnel file states that, "[h]e was instrumental in procuring... a number of items of equipment which have been purchased at very reasonable costs." The file states that in 1985-86, Metzger had been "instrumental in the upgrading of existing polarizing microscopes at a significant cost savings for the bureau."

---

[7]     See ¶¶51-53, infra.

13

46.    During approximately the same period, Metzger incorporated a private forensic science consulting business called Microanalytics, Inc.

47.    In July 1989, with the implementation of DNA testing in Illinois imminent, Metzger elected to transfer to the newly-created DNA Research section with the title of Research Coordinator.  Metzger thereafter assisted in designing and equipping the ISP's temporary DNA laboratory, made budget projections, coordinated the implementation of genetic marker technology and evaluated new laboratory equipment.

48.    While Metzger received criticism for his less-than-accurate paperwork, the ISP file states that he was "instrumental in the preparation for setting up the bureau's [permanent] DNA laboratory," and served as the ISP's principal research and development contact for the project.  "He designed [the] floor plans for the DNA section, ordered benchware and ordered equipment for the DNA laboratory," and was involved with its budget.

49.    Over time, Metzger's duties expanded to include responsibility for maintaining DNA-related equipment, including critical reagents (PCR kits) and other chemicals, and the evidence inventory.  He coordinated reagent preparation and was responsible for maintaining quality assurance records.  He assisted in the training of DNA offender indexing personnel (the offender database index became operational in August 1992).

50.    However, despite these duties, Metzger did not personally perform any DNA casework prior to August 1992, shortly before he destroyed original evidence samples in the Stephens case.  He was not certified in the use of DNA methodology then or at any time during the period he was assigned to the Stephens case.  The ISP DNA laboratory was itself an unaccredited lab until 1994.

14

51.     In 1992-93, the ISP reprimanded Metzger for violating DNA protocols in one of his cases. C. 1113. While his personnel file does not identify the specific case Metzger botched, his case file in the Stephens case reveals that he was ordered by the Will County Sheriff to explain in writing how he had destroyed original evidence in that case. Metzger's written explanation to Will County officials is missing from either the case file or his personnel file.

52.     On April 20, 1995, David Metzger was placed on administrative leave, denied access to all ISP facilities without permission and an escort, ordered to report daily by telephone to the ISP, and directed to return any ISP property in his possession as the result of "an incident occurring on or about January 7, 1995, involving a state-owned microscope." Although documents detailing this "incident" are missing from Metzger's personnel file, the Illinois Supreme Court has found that Metzger and another ISP employee, Phillip Sallee, stole an electron microscope.

53.     Metzger's job performance rating for the period April 1994-April 1995 indicates his judgment was unacceptably poor. Specifically, the ISP noted that Metzger's action, "will have a negative impact upon the department, division and bureau for a long period of time. This error in judgment impacts operational issues and will cause a need for a large amount of financial resources to be expended." C. 1116. Again, the ISP file contains no supporting documentation that details Metzger's so-called "error in judgment".

54.     The ISP file does indicate that in May 1995 Metzger entered into a "pre-disciplinary" settlement agreement with the ISP, whereby he was suspended without pay for 100 days, and required to perform 120-hours of "voluntary" community service, forfeit 75 hours of accrued vacation time and waive his right to challenge this agreement through the union. Metzger further agreed that the ISP reserved the right to impose additional sanctions in the future. The terms of the

15

settlement agreement were "in lieu of [Metzger's] discharge" from the ISP. Metzger did not return to work until August 30, 1995.

55.     Metzger's ISP file reveals that during the five years preceding his testimony as a prosecution witness at Mr. Hickey's trial, he held the positions of Forensic Science and Public Service Administrator, but, after his suspension in 1995, held the position of DNA Research Coordinator. Despite this record of employment, Metzger testified that he had been a DNA Research Coordinator for the past five years (R.1153), and that he had been continuously employed by the ISP for the past fourteen years. R. 1206.

E.     The Expert Testimony at Trial.

56.     Metzger explained generally the process of RFLP DNA typing, the method by which autorads were produced and analyzed in the process, and the method by which population frequency calculations were made. Metzger opined that the unknown sample was a "match" with Arthur Dale Hickey's sample. R. 1190-1200,1239-40.

57.     Using the "product rule" or "fixed bin" method of frequency calculations, Metzger believed that the first five probes indicated that Hickey's DNA occurs once in every 15 billion people. Using eight of the nine probes, and the National Research Council's controversial "modified ceiling approach" method of calculation, the frequency would be one in every 43 billion people. R. 1200-06, 1254-61. Metzger did not believe the NRC's "modified ceiling approach" was valid, but acknowledged other scientists did. R. 1256-58. Metzger had limited knowledge concerning the science of population genetics. R. 1210-18.

16

58.    Metzger possessed a bachelor's degree in science, and had taken additional courses in forensic DNA analysis and other areas. R. 1154-56. In Hickey's case, Metzger's methodology and conclusions were not subjected to peer review. R. 1240.

59.    Michael Conneally testified as an expert witness for the state in the areas of medical genetics, neurology and population genetics. He was familiar with the ISP DNA protocols and its population databases, both of which were similar to those employed by the FBI and, he believed, scientifically valid. R. 1277-81, 1290, 1297, 1321. In Conneally's opinion, the autorads produced by Metzger were of excellent quality. R. 1291-92. He also believed that the ISP's use of the "product rule" to calculate population frequencies was scientifically valid. R. 1281-89, 1313-26. He agreed with Metzger's frequency calculations. R. 1292-93, 1298-99.

60.    Conneally acknowledged that DNA can degrade, and admitted that degraded DNA could lead to "false positive or "false negative" results. R. 1310-11.

61.    Randell Libby, a molecular geneticist, testified as an expert witness for the defense. Dr. Libby testified that the ISP lab was operating in violation of the National Research Council 1992 guidelines on the evaluation of forensic DNA evidence in that they did not report lab error rates, did not properly conduct blind proficiency testing, and did not monitor the lab's level of reproducibility. R. 1452-54, 1483-85. David Metzger had not done well on certain open proficiency testing. R. 1450-52, 1459-60.

62.    Dr. Libby was aware that Metzger had overexposed the initial samples to cutting enzyme, and had thus ruined this evidence. However, Metzger also ignored ISP DNA protocol when he discarded the PCR typing strips, which he developed for the initial biological samples. The misuse of cutting enzyme can cause extra bands, or band-shifting, to appear on RFLP autorads,

17

resulting in autorads that may not be reliable. The use of "monomorphic probes" is a control against such band shifting, but, again, Metzger used only polymorphic probes. Another control that Metzger failed to use, also violating ISP DNA protocols, was the "F3 cell line" or "total swab" sample. R. 1399-1415, 1460-74. Metzger violated protocol when he did not verify the specificity of the cutting enzyme. R. 1419-20.

63.     Other problems with Metzger's DNA analysis included the poor quality of the blood sample retrieved from Jeff Stephens' sweatshirt, and the degradation of virtually all of the DNA samples. Every autorad Libby examined displayed extra bands, or bands that were too light or too dark, either due to contamination or degradation of the samples, or to other causes. R. 1416-21, 1467-80. For these reasons and others, Dr. Libby concluded that Metzger was not justified in declaring a match between Hickey's DNA sample and the suspect sample. Based on the autorads, Metzger's results were "inconclusive," particularly in context of the ISP lab's 2 ½ percent margin of error. R. 1421-40, 1487-89, 1498-99.

64.     The trial court precluded introduction of a gel yield analysis, or densitometry study, prepared by Dr. Libby two days before his testimony that quantified the extent to which the samples demonstrated band-shifting and sample degradation. R.1441-49.

65.     Dr. Lawrence Mueller also testified as an expert witness for the defense in the area of population genetics. Dr. Mueller, applying principles that were approved by the NRC in 1992, calculated the frequency of the five genetic markers utilized by Metzger to be somewhere between one in 1400 and one in 32,000, most likely about one in 7,800. Using the modified ceiling approach and a heterogeneous database, the frequency of a random match was one in 1,800 people. R. 1661-72.

18

66.     In rebuttal for the state, William Frank, an ISP DNA Research Coordinator, testified that he had reviewed Metzger's working file, and found the autorads which were produced sufficient to support Metzger's "match" testimony. R. 1733-43, 1752-53. Frank also agreed with Metzger and Conneallys' frequency calculations, but disagreed with Dr. Mueller's frequency calculation. R. 1755-59.

67.     Frank admitted that there was some degradation of virtually every blood or sperm sample from which the autorads were produced. Degradation can occur due to interaction with a variety of outside agents, including chemicals, solvents, enzymes, proteins, foreign materials, soil, heat, and humidity. However, Frank insisted that the degradation of samples in this case did not contaminate the DNA or undermine Metzger's opinions. R. 1740-47, 1765-70. He found no evidence of prohibitive "cross contamination" involving the mixing of one sample with another person's blood or DNA. R. 1769-76. Frank did admit that, in at least one case, David Metzger had not correctly performed the RFLP typing procedure. R. 1771.

68.     The jury convicted Arthur Dale Hickey of first-degree murder, attempted murder, home invasion, aggravated criminal sexual assault, and aggravated battery with a firearm. R. 1956.

F.      The Sentencing Phase.

69.     Mr. Hickey moved unsuccessfully to preclude the death penalty on the ground the state had not proved him guilty beyond a reasonable doubt of the offense of home invasion, and

19

could not prove, as a matter of law required under 720 ILCS 5/9-1(B)(6)[8], that the murder of Jeff Stephens occurred "in the course of" any other felony. R. 1965-78.

70.    During the eligibility phase, Mr. Hickey called two witnesses in a further attempt to demonstrate that he was not the offender. Investigator Gloria DeLeon told the jury about Robert Anderson's identification of a tan car in nearby Coal City.  Her investigation showed this car belonged to the girlfriend of Kevin Stephens, Jeff Stephens' cousin, and that Kevin Stephens' best friend was a man named Joseph Collins, who was white, 5'1", 25-years-old, and blond. R. 1979-84.

71.    The jury found Arthur Dale Hickey eligible for the death penalty based on a felony murder, involving the predicate felonies of home invasion, armed robbery and aggravated criminal sexual assault.[9]  C. 693, 703, R. 2080.

72.    Thereafter, the state presented two witnesses in aggravation.  Heather Stephens read a victim impact statement to the jury. R. 2066-73.  A Will County Sheriff investigator informed the jury of Arthur Dale Hickey's 1992 guilty plea to criminal sexual assault involving his underage stepdaughter, Michelle Adermann.  According to this witness, Hickey allegedly engaged in other sex acts with Michelle, and her sister Christine, but was not prosecuted. R. 2045-66.  The jury was also informed of Hickey's 1977 guilty plea to burglary.  R. 2076.

73.    In mitigation, the defense also called two witnesses.  Harold Barnes, a mitigation specialist, interviewed numerous family members, friends or neighbors of Hickey's.  R. 2083-84.

---

[8]    This statute says in relevant part that an individual who commits first degree murder is eligible for the death penalty if the murder occurred "in the course of ... one or more of the following [felonies]: armed robbery, aggravated criminal sexual assault, home invasion."

[9]    During its eligibility deliberations, the jury sent a note requesting the autopsy report. (C. 712)  No written response to this note is indicated.

According to Barnes, Hickey contracted polio at age three and could not walk for two years. Hickey's family was impoverished, and his mother was frequently hospitalized with mental illnesses, euphemistically referred to as "nervous breakdowns." Barnes testified that Hickey's grades were "poor to average," and that he dropped out of high school. However, Hickey was also a hard worker, who was kind to people and animals. R. 2084-2101.

74.     According to Barnes, Arthur Dale Hickey was married when he was 18. He and his wife, Alice, had two children, but eventually divorced due to her infidelities. Hickey's aunt told Barnes that Hickey "never got over the loss of his kids." R. 2095-2100. Mr. Hickey later married Linda Adermann, and provided care to her three children, Michael, Michelle, and Christine, during their mother's frequent absences from the home. Eventually, Linda abandoned the Hickey and her children, who never saw her again. All three children spoke well of Mr. Hickey as a parent. R.2102-10. Hickey's friends and neighbors also spoke well of him. R. 2110-14.

75.     Barnes testified that Mr. Hickey helped rescue a man named William Connor when they both fell into a well. R.2101.

76.     Mr. Hickey was a "model prisoner" during two prior stints in prison. During his pretrial incarceration, which lasted more than three years, he received only one disciplinary ticket, for missing a class. R. 2101-02, 2114.

77.     Diana Clover, Mr. Hickey's sister, also told the jury that he provided good care to Linda Adermann's children after she abandoned them. Mrs. Clover, who had custody of Christine Adermann and David Hickey, Arthur Hickey's youngest son, testified that both kids loved him and would have been in court to support him, except for school. R. 2119-27.

21

78.    The jury found that there was no mitigation sufficient to preclude imposition of the death penalty. R. 2168.

G.    <u>Post-Conviction Attempts to Obtain DNA Evidence.</u>

79.    At the state post-conviction stage, Mr. Hickey moved to preserve the DNA evidence be preserved. However, when he moved to obtain certain DNA evidence, including the trial evidence, for examination and testing by a retained DNA expert, this request was denied. The request contemplated not only additional testing of the vaginal swab, which had formed the basis for comparison to the Hickey sample, but also the testing of numerous pieces of evidence that were never tested: Vaginal smears on slides located in the Heather Stephens' rape evidence collection kit (ISP Ex. 17); a "Kool" cigarette butt (ISP Ex. 2) found in the driveway and presumably left by the offender; and certain articles of Heather Stephens' clothing in the possession of the Will County Sheriff (WCS), including her blue robe (WCS Ex. 14) and white terry cloth gown. (WCS Ex. 26). Mrs. Stephens had advised authorities that she was wearing these articles at the time she was attacked, and believed her attacker ejaculated on this clothing (C. 1037), yet neither this clothing nor any piece of bedding was ever submitted to the ISP for DNA analysis. C. 1612-18, 1676-81.

80.    Mr. Hickey questioned the chain of custody pertaining of the DNA evidence. The post-conviction court basically rejected his offer of proof that, during the months between the ISP's initial receipt of the evidence samples that Metzger destroyed and Metzger's receipt of additional samples from the Will County Sheriff, he was arrested for the sexual assault of his stepdaughter and required to give a blood sample to Will County law enforcement officials. C. 1687-88. Post-conviction counsel explicitly advised the court that they needed to explore the possibility that Hickey's sample had been substituted. R.2289-90. The state moved to quash records subpoenas

which Mr. Hickey's post-conviction counsel had served, and the court deferred making ruling until the date for the hearing on the state's motion to dismiss the post-conviction petition. R. 2264-68.

81.     Thereafter, on the date of this hearing, the court quashed these subpoenas. R. 2292-94. The state offered to provide certain evidence logs to Hickey's post-conviction counsel, but only after the court had ruled on its motion to dismiss. R. 2287-88, 2295.

82.     Finally, Mr. Hickey tried to subpoena the unredacted personnel file for David Metzger. However, the court quashed this subpoena, too, then summarily dismissed Hickey's amended post-conviction petitions. R. 2292-99.

        H.     The Post-Conviction Mitigation Investigation.

83.     In her state post-conviction affidavit, mitigation specialist Alice Washington states that preparation of a capital mitigation case requires the defense to acquire all records pertaining to the client. Hickey's trial team had gathered none. Consequently, the evidence presented in mitigation was incomplete and inaccurate. Significant evidence of Hickey's neuropsychological deficits was completely ignored. This was a substantial failure on counsel's part. The anecdotal information that Hickey's lawyers received from him, his family and friends was merely the starting point for an appropriate mitigation investigation. Since quite often these individuals are not the most reliable reporters, it is essential to obtain available records and other evidence to correct or corroborate the information such witnesses may provide. In addition, expert referrals may be indicated. C. 1359-62.

84.     On July 23, 1998, Mr. Hickey was examined by Harry E. Gunn, PhD at the Pontiac Correctional Center. Among the tests conducted at that time, Dr. Gunn performed an IQ test, the Wechsler Adult Intelligence Scale, Revised (WAIS-R). Hickey scored a Verbal IQ of 72, a

Performance IQ of 75 and a Full Scale IQ of 73, leading to the diagnosis that Hickey is "borderline"mentally retarded. Dr. Gunn noted, however, that Hickey had one hand handcuffed during the test, a fact that might affect these results. Dr, Gunn also saw evidence of organic brain impairment and recommended further testing. C. 1768-70.

85.    Based upon the reported medical history of childhood polio, Hickey was examined by Dr. William Adair, a psychiatrist, on October 20, 1998, for evidence of post-polio syndrome. However, Dr. Adair concluded that Hickey's medical history and his examination of Hickey were inconsistent with a diagnosis of polio. Rather, he concluded that the events described in Hickey's early childhood– the inability to walk, dress or feed himself– resulted from a cerebral insult. C. 1771-73.

86.    On January 15, 1999, Hickey was examined by Jonathan L. Hess, Ph. D., who confirmed the diagnosis that Hickey suffered from a traumatic brain injury. He further noted that tests were consistent with frontal lobe damage and that Hickey exhibited symptoms of early dementia. C. 1774-78.

87.    In his state post-conviction affidavit, Dr. Mark D. Cunningham, a clinical and forensic psychologist, provided a violence risk assessment and addressed the issue of future dangerousness. First, he stated that the behavioral controls unique to prison settings sharply limit lethal violence and that capital offenders as a class have a low rate of institutional violence compared to other inmates. Individualizing this base rate to Hickey further reduced his potential for future violence. At age 44, Mr. Hickey already was older than most general inmates and newly convicted capital inmates. In general, the rates of anti-social behavior, community violence, parole recidivism, and prison disciplinary infractions all markedly decline with age. Moreover, Hickey had

24

demonstrated a positive and nonviolent adjustment to prior incarcerations. He was not a gang member. Prior to the instant offense, his violence had been confined to a domestic context (yet, he had maintained a close relationship with his extended family). Finally, even if Hickey were considered to pose a disproportionate risk of violence in prison, the construction in Illinois of a new super-maximum prison offered an ultra-secure setting, designed to control such inmates. C. 1363-91.

## GROUNDS FOR GRANTING RELIEF

OVERVIEW

88.     Despite eye witness testimony that exonerated him and the lack of any other physical evidence that linked him to the crime, Arthur Dale Hickey was convicted of capital murder based upon DNA evidence which was mishandled by a forensic analyst who, unknown to the defense, was operating under a cloud of disgrace.

89.     A fair reading of the evidence adduced at trial demonstrates the critical role that the DNA evidence played in Mr. Hickey's conviction. Mr. Hickey was not identified by any eyewitness. Indeed, various physical descriptions of the offender, including the description provided by Heather Stephens, the surviving victim, were inconsistent with Mr. Hickey's physical description.[10] There

---

[10] Ms. Stephens described the offender as a man in his 20's, 5'2" tall, blond hair, no facial hair, and a small or thin build. In 1991, Mr. Hickey was 40 years old, 5'6" tall, 180 to 190 pounds and stockily built, and had a full mustache and dark head hair, with some gray in it. Although she was shown Mr. Hickey's photograph in several photo lineups, Ms. Stephens never identified him. At trial, when asked to identify Hickey, Heather stated "I've not seen him before."

were no fingerprints or other physical evidence linking Mr. Hickey to the crime scene. Although there was testimony suggesting that Mr. Hickey's vehicle was parked within a short distance of the crime scene, this testimony was equivocal and contradicted.

90.     Mr. Hickey's conviction resulted from the then-nascent use of DNA profiling by the ISP through so-called RFLP testing. This testing method has been almost entirely replaced by newer scientific methods. David Metzger, the ISP forensic analyst, completely destroyed samples originally sent to him in the rape kit by exposing them too long to restriction enzyme. Obtaining a second sample, Mr. Metzger concluded that the offender sample matched Mr. Hickey. Unknown to Hickey or his lawyers, however, Mr. Metzger was required to explain in writing his destruction of the original samples. Moreover, neither Hickey nor jurors knew at the time of the trial and capital sentencing hearing that David Metzger had been implicated in a scandal at ISP involving the theft of a state-owned microscope.

91.     In the state courts, Mr. Hickey argued that the suppression of this material, impeaching evidence by the state violated Brady. The Illinois Supreme Court in Hickey II unreasonably concluded that the suppressed Metzger information was not material. Furthermore, without the benefit of this information, his attorneys were rendered ineffective during the guilt-innocence phase, hindered in their ability to cross-examine Mr. Metzger about his personal and professional misconduct, his potential bias or his motives.

92.     Mr. Hickey suffers from organic brain damage and may be mentally retarded. He has a measured full scale IQ of 73. According to his mother, he suffered from polio at age two and could not walk, feed or dress himself until he was five years old. At school, he exhibited hearing loss, a speech impairment and a learning disability. He was an extremely poor student, who failed the

majority of his classes and was "socially promoted" from second through eighth grade. The United States Supreme Court has held that the execution of mentally retarded defendants is cruel and unusual punishment, prohibited by the Eighth Amendment to the Constitution. Atkins v. Virginia, 122 S. Ct. 2242, 153 L. Ed. 2d 335, 2002 U.S. LEXIS 4648 ( 2002).

93.     Mr. Hickey's trial counsel were constitutionally ineffective in failing to investigate or develop evidence of his reduced mental capacity in mitigation at sentencing. There is a reasonable probability that such evidence, as well as the strongly mitigating evidence Mr. Hickey suffers a brain impairment to his frontal lobe and early dementia, would have changed the outcome at sentencing.

94.     Thereafter, during the state post-conviction proceedings, after the partial information detailed herein concerning Mr. Metzger's theft, misconduct and professional incompetence emerged, Mr. Hickey endeavored to conduct an investigation, as he was required in that proceeding to raise all claims of constitutional deprivation not otherwise spread of record. He simultaneously sought to have independent DNA testing conducted on some of the significant crime samples in the case, as well as items of evidence which inexplicably were never submitted to the ISP for DNA testing by Will County law enforcement officials. Likewise, Hickey sought record evidence relating to the chain of custody of the DNA evidence, including when and under what circumstances such evidence was collected and maintained. The state courts denied Hickey access to the DNA evidence, refused to permit additional DNA testing, and basically quashed the investigation before it ever got underway. Yet, each of these investigative requests was essential to state post-conviction counsels'

27

ability to fulfill the obligations imposed upon them by state law to assess Hickey's potential constitutional claims, including the claim he is actually innocent, and to appropriately amend the pleadings.[11]

## TRIAL ISSUES

I.  **Arthur Hickey Was Denied Due Process of Law in Violation of the Fifth, Sixth and Fourteenth Amendments to the Constitution When Prosecutors Failed to Disclose Exculpatory Evidence Concerning David Metzger's Employment History, Thereby Concealing Material Facts Regarding Metzger's Theft of Property, Professional Malfeasance, and Personal Motives and Biases.**

95.     Mr. Hickey repeats and realleges ¶¶36-58 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

96.     David Metzger was the state's primary DNA witness. The testimony of  Michael Conneally and William Frank refers to Metzger's work.  ¶¶59-60, 66.

97.     Unknown to Mr. Hickey, his lawyers or the jury, the ISP had reprimanded Metzger in the past for ignoring its DNA protocols.

98.     Also unknown to Mr. Hickey, his lawyers or the jury, the ISP had held out Metzger to user agencies in Illinois and elsewhere as a consultant and witness.  The ISP recognized Metzger's activities affected the good reputation of its crime laboratory, and, more broadly the department itself.

99.     Yet, also unknown to Mr. Hickey, his lawyers or the jury, in May 1995, the ISP suspended Metzger without pay in lieu of firing him for stealing a state-owned electron microscope from the lab.  In this instance, the ISP concluded Metzger's misconduct would have long-term,

---

[11]     Mr. Hickey's post-conviction counsel thus could not certify that they had performed the minimal duties imposed upon them by Illinois Supreme Court Rule 651(c).

adverse consequences for the operation and finances of the DNA and crime laboratories and the department as a whole.

100.    As for Metzger's supposed expertise in the area of DNA analysis, it appears that as of September 1992, when he first worked on the Stephens case, he was not certified in DNA methodology and had little formal DNA training. This evidence also was not disclosed.

101.    At the time of trial in Mr. Hickey's case, it was known to Hickey, his lawyers and the jury that Metzger had destroyed original biological samples, but not that he was ordered to explain in writing the errors which led to the destruction of this evidence. If Metzger ever complied, there is no copy of his written explanation contained in his ISP personnel file. If Metzger did not comply, there is no satisfactory explanation why.

102.    Under the terms of an imposed and one-sided agreement, the ISP unilaterally also reserved the right to impose future sanctions, while Metzger waived his rights to grieve or challenge these sanctions. The agreement between the ISP and Metzger presumably was in full force and effect when he testified against Arthur Dale Hickey, but remained undisclosed, largely due to the state's efforts. The evidence is that Metzger had just returned to work after a lengthy suspension without pay when he was called upon by state prosecutors to testify at Hickey's trial.

103.    And, despite his recent reinstatement to the ISP, Metzger's personal circumstances at the time he testified were not unlike those of a government cooperator, testifying pursuant to the terms of a plea agreement. Evidence of the existence of the agreement between the ISP and Metzger was therefore highly material because, except for the state, no one knew that Metzger's testimony as an employee of the ISP may have been colored by his personal interests, including dealing with the stigma of being labeled a thief while trying to re-build his standing within the ISP, if not the law

29

enforcement community in general. Metzger even had financial incentive, given that he only recently had returned to work after a lengthy layoff during which time he was not paid. Viewed simply in terms of Metzger's professional qualifications or expertise, his ISP file contained material evidence, relevant both to his experience and training in DNA casework.

104. The state knew or should have known that evidence tending to undermine the reliability of its DNA evidence, which also seriously impeached its principal DNA witness, constituted material and favorable evidence subject to disclosure under <u>Brady v. Maryland</u> and its progeny.

105. Notwithstanding this, prosecutors here not only failed voluntarily to disclose any of this evidence to Mr. Hickey and his lawyers, including the facts of Metzger's suspension and negative performance evaluations, they actively opposed efforts by the defense to obtain this evidence on its own.

106. Metzger's credibility should have been fair game given his central role vis a vis the DNA evidence, the dearth of any other prosecution evidence sufficient to convict, and the reliable testimony of witnesses, including Heather Stephens, that Arthur Dale Hickey was not the offender. There is a reasonable probability that, but for the constitutional violations set forth above, the outcome of Hickey's trial would have been different.

II. **Arthur Dale Hickey Was Denied Due Process and a Fair Trial When, as the Result of the Trial Court's Rulings, the Jury Was Not Informed of Evidence Bearing Upon David Metzger's Professional Qualifications and Employment History, Theft of Property, Professional Malfeasance and Personal Motives and Biases.**

107. Mr. Hickey repeats and realleges ¶¶95-105 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

108. The trial court was aware of this evidence because it had reviewed Metzger's personnel file in camera, then refused to disclose any of it to Hickey, his lawyers or the jury.

109. This refusal denied Mr. Hickey due process of law and a fair trial where, as a result, Hickey's lawyers failed adequately to cross-examine Metzger or present any evidence or arguments about these matters. The DNA evidence in this case was closely balanced, as the state experts basically testified that the suspect DNA matched Hickey's DNA, while the defense experts testified it did not, and testified moreover that the state's DNA evidence was unreliable.

110. Indeed, apart from the state's DNA evidence, there was a dearth of evidence sufficient to convict Hickey; on the other hand, the testimony of Heather Stephens and others strongly indicated he was not guilty. Metzger's testimony was undoubtedly critical to the prosecution's case against Hickey, yet the jury was forced to render verdict without access to all of the relevant evidence that it needed in order to make an informed and fair judgment about his credibility. As a result, Hickey was denied due process and a fair trial.

111. The trial court's ruling, by depriving both Hickey and the jury of such evidence, clearly may have affected the outcome, thereby denying Hickey due process and depriving him of a fair and impartial jury trial.

**III.** **Arthur Hickey Was Denied Due Process of Law in Violation of the Fifth, Sixth and Fourteenth Amendments to the Constitution Where Prosecutors Offered Materially False and Misleading Evidence Concerning David Metzger's Employment History in Order to Conceal His Personal Misconduct, Professional Malfeasance and His Potential for Bias.**

112. Mr. Hickey repeats and realleges ¶¶36, 95-106 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

113. Metzger testified on direct examination for the state that he had been a DNA Research

Coordinator for the five years preceding this testimony in Mr. Hickey's case (R. 1153), when, in fact, it appears he was demoted as part of a disciplinary settlement in lieu of discharge. Metzger's undisclosed personnel record reveals that, prior to his suspension, he had held the positions of Forensic Science and Public Service Administrator. Metzger held these positions <u>after</u> having held the position of DNA Research Coordinator at least as far back as 1992. Had Metzger testified truthfully, Hickey's lawyers could have questioned him as to the reasons for the apparent demotion. Consequently, Metzger's false testimony was also materially misleading.

114.    Metzger also testified on direct examination that he had been continuously employed continuously by the ISP for fourteen years (R. 1206), ignoring that he had just recently completed a lengthy suspension without pay, during which time he was barred (unless escorted) from all ISP facilities. Had Metzger testified truthfully, he would have opened the door to the exploration of his recent troubles at work, greatly affecting his credibility as a witness. Consequently, Metzger's false testimony in this regard also was materially misleading.

115.    The state knew or should have known that Metzger's testimony was materially false and misleading, but did nothing to correct the false impressions thereby created.

116.    There is a reasonable probability that, but for the constitutional violations set forth above, the outcome of Arthur Dale Hickey's trial would have been different.

**IV.    Arthur Hickey Was Denied the Effective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments to the United States Constitution When His Lawyers Failed to Adequately Cross-Examine Metzger.**

117.    Mr. Hickey repeats and realleges ¶¶95-103, 108-10, 112-13 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

118. As the result of the state's failure to disclose this evidence, its failure to correct the false and misleading impressions created by this non-disclosure, and the trial court's ruling denying them access to the ISP personnel file for Metzger, Mr. Hickey's lawyers could not adequately or competently cross-examine Metzger about his professional qualifications. Counsel, for example, would not have known that Metzger was neither certified nor especially highly trained in DNA methodology when he performed the work in the Stephens case. Without the knowledge that Metzger had been required to explain in writing his malfeasance in destroying evidence, and denied access to that writing, Hickey's counsel could not effectively or reliably question him about this aspect of the case.

119. Likewise, defense counsel could not adequately cross-examine Metzger about any bias, his motives, honesty or integrity when they were kept in the dark concerning his personal misconduct and the circumstances of his one-sided suspension in lieu of discharge.

120. The constitutional right to counsel is the right to the effective assistance of counsel.

121. Defense counsel for Arthur Dale Hickey were not reasonably effective because they failed to cross-examine David Metzger about these matters and failed to make appropriate arguments based upon these same matters.

122. There is a reasonable probability that but for defense counsels' unprofessional errors, the result of the proceeding would have been different, particularly given the dearth of other evidence sufficient to convict Hickey and the reliable evidence that shows he is not guilty. Consequently, these errors prejudiced Mr. Hickey.

**V.** **Arthur Hickey Was Denied the Effective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments to the Constitution Where, Because His Lawyers Were Denied Access to David Metzger's Personnel File, They Failed To Adequately Investigate Metzger's Personal Misconduct and Professional Malfeasance.**

123.    Mr. Hickey repeats and realleges ¶¶95-103, 108-10, 112-13, 116-20 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

124.    Metzger's ISP file contained a wealth of investigative leads concerning his personal misconduct and professional ineptitude, including the identity of potential witnesses knowledgeable about Metzger's destruction of evidence in the Stephens case, the violations of ISP DNA protocols, his theft of state property and the related adverse job action.

125.    Metzger's personnel file also contained information that Metzger was a private forensic science consultant, and that he had expertise in identifying and procuring valuable laboratory equipment, including microscopes. Had defense counsel investigated these various leads, they would have acquired information that tended to seriously undermine Metzger's credibility.

126.    Defense counsel were unreasonably failed to investigate these investigative leads.

127.    There is a reasonable probability that but for defense counsels' unprofessional errors, the result of the proceeding would have been different. Consequently, these errors prejudiced Mr. Hickey.

**VI.** **Arthur Hickey Was Denied the Right to Present a Defense in Violation of the Sixth and Fourteenth Amendments to the  Constitution Where, Because His Lawyers Were Denied Access to David Metzger's Personnel File, They Failed to Present Evidence of Metzger's Personal and Professional Misconduct.**

128.    Mr. Hickey repeats and realleges ¶¶95-103, 108-10, 112-13, 116-20, 124-25 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

34

129.    Mr. Hickey's defense was based upon reasonable doubt. The record shows that apart from the DNA evidence based upon David Metzger's work in the Stephens case, prosecutors had no evidence sufficient to convict him, including any reliable identification evidence, statement evidence or other physical evidence. Indeed, the critical nature of the DNA evidence to the state's prosecution of Hickey is underscored by the notation in Metzger's case file in the Stephens case, which indicates that by the Fall of 1992, and at a time when the police were still searching for a perpetrator or perpetrators, he was informed by Will County prosecutors that the eventual success of any future criminal prosecution would depend upon DNA evidence.

130.    Mr. Hickey and his lawyers were denied access to files that contained evidence more than sufficient to undermine Metzger's credibility. The ability to effectively impeach Metzger's credibility would have materially advanced Hickey's reasonable doubt defense, particularly given the dearth of other evidence sufficient to convict him and the relative wealth of reliable exculpatory evidence, starting with Heather Stephens' detailed description of an offender who obviously is not Arthur Dale Hickey.

131.    These suppression of the facts and circumstances detailed herein from Hickey and his lawyers violated Hickey's right to present a defense under the Sixth and Fourteenth Amendments to the Constitution.

## SENTENCING ISSUES

**VII.    The Execution of Arthur Hickey Would Inflict Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the Constitution Because He Is Mentally Retarded.**

132.    Mr. Hickey repeats and realleges ¶¶ 83-86, 92 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

35

133.    In Atkins v. Virginia, 122 S. Ct. 2242, 153 L. Ed. 2d 335, 2002 U.S. LEXIS 4648

(2002), the Supreme Court held that the executions of mentally retarded defendants are "cruel and

unusual punishments" prohibited by the Eighth Amendment to the Federal Constitution. In so doing,

the Atkins Court relied upon two definitions of mental retardation enunciated by established mental

health associations. According to the American Association of Mental Retardation (AAMR):

> Mental retardation refers to substantial limitations in present functioning. It is
> characterized by significantly subaverage intellectual functioning, existing
> concurrently with related limitations in two or more of the following applicable
> adaptive skill areas: communication, self-care, home living, social skills, community
> use, self-direction, health and safety, functional academics, leisure, and work. Mental
> retardation manifests before age 18.

Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992). Similarly,

the American Psychiatric Association states:

> The essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant limitations
> in adaptive functioning in at least two of the following skill areas: communication,
> self-care, home living, social/interpersonal skills, use of community resources,
> self-direction, functional academic skills, work, leisure, health, and safety (Criterion
> B). The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th

ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55

to approximately 70. Id., at 42-43.

134.    As the definitions makes clear, the mental retardation diagnosis depends upon finding

substantial limitations in two areas: a) intellectual function and b) adaptive skills. By definition,

mental retardation manifests before age 18.

135.    Intellectual function is measured, and thus defined, by intelligence tests. It is

quantified by an intelligence quotient (IQ) score. Although no previous IQ scores appear to exist,

Mr. Hickey scored a 73 on the WAIS-R IQ test in 1998.[12]  This result strongly suggests that Mr.

Hickey as "mildly" retarded– a misleading term of art considering that mental retardation is, by

definition a "substantial" or "significant" limitation.

136.     Hickey's background confirms that substantial limitations existed in his adaptive

skills prior to the age of 18.  According to his mother, he suffered from polio at age two and could

not walk, feed or dress himself until he was five years old.  It appears, however, that Hickey's

inability to walk or care for himself before the age of five cannot be so easily explained. Hickey was

born to a poor, uneducated farm family in the early 1950's, at the height of incidence of polio in the

United States and around the introduction of the Salk vaccine.  Dr. Adair concluded that the events

described in Arthur's early childhood were inconsistent with a diagnosis of polio and likely resulted

from a cerebral insult.   Whatever the etiology, Arthur Dale Hickey manifested significant

developmental delays at an early age.

137.     Arthur arrived in first grade in the Wilmington School District at eight years old.  The

school physician noted that he had a speech deficit.  His teeth needed immediate attention.  In 1965,

at eleven years old, the school reported a severe loss of hearing in his left ear.

138.     He spent two years in first grade and was "socially" promoted, i.e, assigned rather

than promoted from second grade through tenth. Entering high school at sixteen years old and

dropping out when he turned eighteen, Mr. Hickey's subaverage academic functioning was

accompanied by notable deficits in at least the following skill areas: Communication, self-care,

-------

[12]     The WAIS-R test has been supplanted by the WAIS-III test in current practice.  A
statistical comparison of the two tests concludes that subjects will score 2.9 points lower on the
newer WAIS-III test.

social/interpersonal skills, and self-direction. His grooming was noticeably deficient, he lacked self-esteem, and he was socially isolated. His writing skills were rudimentary. Hickey's sophomore English teacher recalls that he was incapable of organizing or retaining an abstract thought and that he could not write a complete sentence. Although he was not a problem student, he was significantly absent during high school. Hickey dropped out after failing driver's education. Affidavit of Mary Ellen Thomas, Exhibit 5; Affidavit of Kent Moon, Exhibit 6.

139.    There is substantial evidence that Mr. Hickey is mentally retarded. He is, and was before the age 18, substantially limited in intellectual function and adaptive skills. His execution would be cruel and unusual punishment, proscribed by the Eighth Amendment.

## VIII.    Arthur Hickey Was Denied the Effective Assistance of Counsel in Violation of the Sixth Amendment to the Constitution Where His Counsel Failed to Conduct An Adequate Mitigation Investigation and Failed to Develop Significant Mitigation Evidence Sufficient to Preclude Imposition of the Death Penalty.

140.    Mr. Hickey repeats and realleges ¶¶ 83-87, 92, 133-139 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

141.    Hickey's lawyers did not obtain pertinent medical and school records. This was unreasonable, and a substantial failure on their part, because acquiring these records would have cast doubt on some of the anecdotal information received from Hickey, his family and his friends, and would have led to a more probing background investigation. Such investigation in this case would have revealed powerful mitigating evidence of mental retardation, childhood head trauma, organic brain damage and early dementia.

142.    As it was, defense counsel perpetrated a mythic life for Hickey: A hardscrabble existence amidst a close and loving family, albeit one in which his mother was mentally ill and frequently hospitalized for "nervous breakdowns." R. 2084-2101.

143.    Yet, it is extremely difficult to make an individual "look good" when he has allegedly killed a man and sexually assaulted and shot that man's wife. It is virtually impossible when, in aggravation, the evidence is that the same individual has sexually abused his underage stepdaughter.[13] Under these circumstances, it was not reasonable strategy to counter that Hickey was a devoted father and family man or that he was nice to people and animals, certainly not without first conducting reasonable investigation to determine whether Hickey was actually mentally retarded and brain-damaged.

144.    Trial counsel were also ineffective in their failure to present the jury with an accurate assessment of Hickey's future dangerousness. Despite counsels' awareness that Arthur Hickey was a "model prisoner," who had received one disciplinary ticket (for arriving late to a class) (R. 2101-02, 2114), they failed to make the crucial link between Hickey's demonstrated adaptability to institutionalized life and the prosecution's claim that he was violent and dangerous, with no possibility for rehabilitation. Actuarial data reveal that capital prisoners actually pose a lesser security risk than general population inmates, that Arthur Dale Hickey's risk of future dangerousness is further reduced because of his age and will continue to diminish over time. Such evidence was qualitatively different, far more probative and actually mitigating than the anecdotal report of Harold

---

[13]    Indeed, this latter evidence was so powerful that it prompted a juror to comment after trial that Hickey was "evil." C. 1478.

Barnes, whose sole "insight" concerning the issue was to say that, "It's incredible," Hickey had only received one ticket.

145. As a result of counsels' failure to adequately investigate the case, they were not reasonably prepared or able to advance appropriate arguments. Even when they did make appropriate arguments, counsel were not reasonably prepared or able to supply the jury with available supporting evidence or documentation because they had failed to acquire it.

146. The constitutional right to counsel is the right to the effective assistance of counsel.

147. Defense counsel here were not reasonably effective in failing to conduct an adequate mitigation investigation.

148. There is a reasonable probability that but for defense counsels' unprofessional errors, the result of the capital sentencing hearing would have been different. Surely, evidence that Mr. Hickey may be retarded or suffers from organic brain damage would have changed the outcome at sentencing. Consequently, these errors prejudiced Mr. Hickey.

**IX. Arthur Hickey Was Denied Due Process and Equal Protection in Violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution Where the Illinois Courts Denied His Production Requests and Summarily Dismissed His Amended Post-conviction Petitions, Thereby Depriving Him of a Fair Chance to Demonstrate His Actual Innocence.**

149. Mr. Hickey repeats and realleges ¶¶ 79-82 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

150. Illinois confers on those sentenced to death an opportunity in post-conviction proceedings to show with extra-record evidence that their conviction and/or sentence violated the

Illinois or federal constitutions. In the present case, the Illinois courts arbitrarily denied Hickey a chance to investigate, develop and present evidence necessary to a meaningful review of his federal constitutional claims. Mr. Hickey was thus denied due process of law.

151.     But for the DNA evidence, there was little, if any, credible evidence in the trial record to implicate Hickey in the crimes for which he was convicted; indeed, the eyewitness and occurrence witness testimony, including that of Heather Stephens, exonerates him. One cannot examine the police artist's sketch of the offender, based on Mrs. Stephens' careful description, and ignore the possibility that Mr. Hickey may actually be innocent.

152.     Although there is no legitimate justification in a capital case to prevent post-conviction counsel from examining the physical evidence as part of their investigation of a client's claims of substantial constitutional deprivation, the trial court's rulings had this precise effect in Hickey's case. Factors such as the artist's sketch of the offender, clearly depicting an individual other than Arthur Hickey, and Heather's statements concerning the likely presence of the offender's ejaculate on her bed clothes and bedding, are so obviously relevant to Hickey's claim of actual innocence that the court's rulings, which effectively terminated the post-conviction investigation, deprived Hickey a meaningful opportunity to be heard.

153.     The refusal to permit Mr. Hickey's post-conviction counsel to investigate can not be rationalized on the basis that it was intended to prevent a fishing expedition, since the proposed investigation was actually specific and quite circumspect. First, Hickey naturally requested access to the *unexamined* evidence in the possession of the state in order to have it examined for the first time by an expert of his choosing. Second, because Hickey's trial counsel had never moved to examine the incriminating sample, this task was left to post-conviction counsel, who therefore had

retained a DNA expert to independently test the sample, too. Mr. Hickey also sought official records concerning when, where and how the police had first acquired the incriminating sample, where they stored it, how they maintained it before sending the sample to the ISP, and who had access to the sample during this time. Finally, Hickey sought additional official records relating to Metzger's job performance, including Metzger's written explanation concerning his destruction of the rape kit specimens.

154.    A glaringly apparent and unique aspect of Hickey's case is that the great bulk of the evidence necessary to even a minimally adequate post-conviction investigation was in the exclusive possession and control of the state. Thus, when prosecutors refused to voluntarily produce it, as they did, for example, in the case of Metzger's written explanation of his destruction of the DNA evidence, Hickey's only recourse was to request the trial court to order its production. The trial court's refusal to grant Mr. Hickey access to the physical evidence, consisting of both the incriminating sample and the unexamined crime scene evidence, for independent testing, effectively made it impossible for post-conviction counsel to fairly assess Hickey's potential constitutional claims, to develop the facts needed to support such claims, or, ultimately, to prepare amended state post-conviction pleadings sufficient to withstand a motion to dismiss. For example, trial counsel's failure to introduce the results of DNA testing clearly may or may not constitute ineffective assistance of counsel, but without access to the evidence, Mr. Hickey can never satisfy the prejudice prong of Strickland.

155.    The rulings of the Illinois courts were so patently unfair that they reduced the instant post-conviction proceedings to a charade, making the summary dismissal of Mr. Hickey's post-conviction petitions all but inevitable. Even if a post-conviction corrective procedure were not

42

constitutionally required, once a state provides such a procedure, that procedure must comport with due process. The Illinois courts violated this constitutional principle <u>ab initio</u> when they cut off Hickey's ability to conduct a basic fact investigation, effectively reducing the promise of a full and fair hearing in this case to "a meaningless ritual."

156. A capital post-conviction petitioner in Illinois possesses a substantial expectation of relief where he proves whatever he must in order to demonstrate a violation of the Illinois or federal constitution. Hickey had a substantial expectation of relief for his claimed constitutional violation where the process employed was adjudicatory and where it would enhance the reliability of the truth-seeking process. 725 ILCS 5/122-1(a). Part of Illinois' procedure for permitting post-conviction redress of constitutional error at trial and sentencing is to appoint counsel to represent an indigent capital post-conviction petitioner. Although not governed by the constitution's guarantee to the effective assistance of counsel, the Illinois statute, Illinois Supreme Court Rules, and case law require reasonable representation by counsel and the adequate presentation of the petitioner's post-conviction claims.

146. Here, the possibility of Hickey's innocence is so powerful that when the trial court refused to afford Hickey a fair chance either to investigate or develop his claims, post-conviction counsel simply could not in good faith certify that they had performed the minimal duties imposed upon them by Illinois law.

147. Arthur Dale Hickey also clearly has been denied an opportunity to exercise a right possessed by every other capital post-conviction petitioner in Illinois: The opportunity to seek post-conviction redress of constitutional violations resulting in his conviction and sentence. Because he has not been treated like similarly-situated capital post-conviction petitioners in Illinois, Hickey has

43

been denied equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

**X.      Arthur Dale Hickey Was Denied Due Process in Violation of the Fifth and Fourteenth Amendments to the United States Constitution Where the Illinois Supreme Court Made Factual Findings in the Absence of Evidence, While Denying Him an Opportunity to Develop or Present Evidence in Support of His Constitutional Claims.**

148.      Mr. Hickey repeats and realleges paragraphs ¶¶ 9, 11 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

149.      Despite the refusal of the state post-conviction court to allow discovery or an evidentiary hearing, the Illinois Supreme Court in Hickey II, buttressed its reasoning, by speculating (1) that the reprimand for Metzger's sloppy and unprofessional work related to this case; (2) that Metzger did not write a letter to the Will County sheriff explaining his mishandling of the physical evidence; and (3) that any such letter would have been cumulative of the testimony presented at trial.

150.      Finally, the Court discounted the undisputed fact in the record that Mr. Hickey has a measurable IQ of 73, asserting that the validity of the test was questionable because he had only one hand free. Overlooking the fact that the testing must be conducted at the condemned unit of the Pontiac Correctional Center, which, in the normal course of events, requires prisoners to remain handcuffed or shackled, the Court sub silentio inferred that Hickey was not mentally retarded.

151.      The record is insufficient to elevate such rank speculation to the level of binding factual findings. At the very least, the Illinois Supreme Court should have allowed an evidentiary hearing and given Mr. Hickey a fair opportunity to develop the factual basis of his claim, so as to eliminate further resort to guesswork.

152. In making binding factual findings in the absence of any evidence and in denying Hickey an opportunity to develop or present contrary evidence, the Illinois Court denied him due process of law.

**XI.   The Illinois Supreme Court Unreasonably Applied <u>Teague v. Lane</u> When it Refused to Apply its Rules Retroactively to Grant Mr. Hickey a New Trial.**

153. Mr. Hickey repeats and realleges paragraph 148 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

154. The Illinois Supreme Court promulgated amendments to its Rules applicable to capital cases effective March 1, 2001. The purpose of these amendments is to "enhance the truth-seeking process," to "ensure that capital defendants receive fair and impartial trials and sentencing hearings," and "to minimize the occurrence of error" in capital trials. Ill. S. Ct. Rule 416 and Committee Comments. Mr. Hickey did not have the benefit of these amendments since the death penalty was imposed prior to their effective date.

155. Mr. Hickey argued that the suppression of the material, impeaching evidence by the state concerning David Metzger violates <u>Brady</u>. Certainly, if this case were tried in Illinois today, this information would be routinely disclosed pursuant to Illinois Supreme Court Rule 417.

156. Illinois Supreme Court Rule 416(e), authorizing discovery depositions in capital cases, was not available to Mr. Hickey. Discovery depositions enhance the truth-seeking process of capital trials by providing counsel with an additional method to discover relevant information and prepare to confront key witness testimony. The availability of discovery depositions may also aid the trial judge in ruling upon motions <u>in limine</u> and evidentiary objections at trial. Committee

Comments, Ill. S. Ct. Rule 416. Without the benefit of a discovery deposition, Hickey's lawyers were inadequately prepared to examine Mr. Metzger at trial.

157. Further, since Mr. Hickey's trial, the Illinois Supreme Court has, by rule, established the requirement that attorneys appearing in capital cases be qualified as members of the Capital Litigation Trial Bar, as well as rigorous requirements for admission to the bar. See Ill S. Ct. Rules 416, 701, 714. Mr. Hickey's lawyers were not, and presently are not, qualified to try a capital case.

158. In Hickey II, the dissenting justices urged that the new supreme court rules governing capital cases should be applied retroactively. As Justice Kilbride observed, "Like many other capital convictions tried under the old rules, defendant's conviction in this case remains suspect because it was obtained through procedures that were inherently unreliable and did not adequately protect a defendant's constitutional rights." Because the new rules are watershed rules of criminal procedure, the Illinois Supreme Court unreasonably applied Teague v. Lane, 489 U.S. 288 (1989), when it refused to apply the rules retroactively and grant Mr. Hickey a new trial.

## XII. Arthur Dale Hickey Is, at a Minimum, Entitled to a Hearing on the Issue of Mental Retardation

159. Mr. Hickey repeats and realleges paragraphs 92, 133, 148 as though fully set forth herein, and incorporates by reference all matters contained in the related exhibits.

160. After the Illinois Supreme Court discounted the results of Hickey's IQ test, Mr. Hickey petitioned for rehearing, requesting that his counsel be allowed to arrange new IQ testing, that the warden of the institution be ordered to permit him free use of his hands during the test, and that he be allowed to supplement the record accordingly. Exhibit 7.

161. Since the Illinois Court's denial of the petition for rehearing, the United States Supreme Court held in <u>Atkins v. Virginia</u> that the execution of mentally retarded defendants violates the Eighth Amendment's proscription against cruel and unusual punishment.

162. Claim VII is a claim that relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. Moreover, Hickey is without fault in failing to develop the factual basis of the claim in state court proceedings. Despite presenting compelling documentary evidence that Hickey is mentally retarded, he was unable to develop and support various aspects of that evidence only because the state court denied him a hearing– a denial that is not attributable to Hickey. 28 USC § 2254(e) (2).

**PRAYER FOR RELIEF**

Based on the foregoing, Arthur Dale Hickey respectfully prays that:

A.     His convictions be reversed and a new trial ordered;

B.     His sentence of death be vacated and modified, or, in the alternative, remanded for a new sentencing hearing;

C.     He be permitted to file legal memoranda in response to pleadings which the State of Illinois may file.

D.     He be granted an evidentiary hearing;

E.     He be permitted, before any evidentiary hearing is conducted, to develop discovery, including but not limited to the taking of depositions, bearing upon the issues raised herein and to supplement this Amended Petition as appropriate.

F.     He be permitted to retain expert assistance and testimony regarding the DNA and

47

mental health issues presented by this Petition, said expert services to be compensated pursuant

to CJA guidelines.

Respectfully submitted,

One of the attorneys for Petitioner
Arthur Dale Hickey

Gary Ravitz
Eric S. Palles
Ravitz & Palles, P.C.
203 N. LaSalle, Ste. 2100
Chicago, Illinois 60601
(312) 558-1689

48

## DECLARATION OF ARTHUR DALE HICKEY

I, ARTHUR DALE HICKEY, declare, under penalty of perjury, that I have reviewed the contents of this Petition with counsel and that the foregoing is true and correct to the best of my knowledge and belief.



_____
Petitioner

Signed and sworn to before me
this 26th day of November, 2002

_____
Notary Public

"OFFICIAL SEAL"
JONATHAN B. LYON
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 08/30/04